Chester R. McNeil, Appellant, v. Edwin M. Bulkley
et al., Trading as Spencer Trask & Company,
Appellees.

## Gen. No. 36,092.

Opinion filed December 30, 1932.   Rehearing denied January 11, 1933.

.1

JUSTUS CHANCELLOR and JUSTUS CHANCELLOR, JR., for appellant.

CUTTING, MOORE & SIDLEY, for appellees; JAMES F. OATES, JR., and JOHN PAULDING BROWN, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

In an action on the case, commenced January 13, 1931, to recover damages for claimed fraud and deceit in the sale of certain bonds by defendants to plaintiff on November 23, 1916, there was a trial without a jury resulting in the court, on February 24, 1932, finding defendants not guilty and entering judgment against plaintiff for costs. The present appeal followed. The bill of exceptions discloses that the trial judge, when making the finding, stated that he would not decide whether or not the misrepresentations upon which plaintiff claimed to have relied, as to the law of the State of Louisiana, had been made by defendants, or whether or not that law was in fact as represented by them, but that "the court has felt from the outset that the Statute of Limitations is a bar in this case."

Plaintiff's declaration consisted of two counts, to which defendants filed a plea of the general issue and a special plea that the supposed causes of action "did not, nor did any or either of them, accrue to the plaintiff at any time within five (5) years next before the commencement of this suit." In the first count it is alleged in substance that "shortly prior to the year 1927" defendants, being engaged in the business of investment bankers at Chicago, offered to sell to plaintiff eight (8)—$500 drainage bonds, of a total series or issue of 600 bonds, of the "Avoca Drainage District, Parish of St. Mary, State of Louisiana," and then and there "falsely and fraudulently represented to plaintiff," to wit: That the bonds were issued pursuant to an act of the legislature of Louisiana to ob-

tain moneys to drain lands in subdrainage district No. 1, in said State, and place them under cultivation; that a tax of $2.05 an acre would be levied annually by the board of drainage commissioners to pay the interest accruing on the bonds and the yearly instalments of principal; that the average selling price of reclaimed land in the district was upwards of $100 an acre; that the taxes were due on January 1st of each year and if not paid on or before July 1st, would become delinquent, and the property would be offered for sale, and if the property was not sold for the amount in arrears it "would be adjudicated to the State"; and that "upon such a contingency *the State of Louisiana would be liable* in exactly the same manner *for the payment of the taxes* for that year and subsequent years as any property holder in the district." It is further alleged that the representations were known to be false by defendants and made for the purpose of inducing plaintiff to purchase the bonds; that he, relying upon the representations, purchased them and paid defendants therefor $3,876.80; that subsequently, in the year 1927, defendants informed him that the district had not collected the taxes and was in default in the payment of interest and instalments of principal and that a committee had been appointed to protect all bondholders, and requested him to deposit his bonds with it and to authorize it to take such action in the premises as it might deem advisable; that plaintiff "declined to deposit his bonds" with the committee, "caused an investigation to be made" as to the truth of defendants' said representations at the time of the sale, and "found them to be false, untrue and without foundation in fact"; that said committee purchased the lands in the district that had been forfeited to the State of Louisiana and undertook to carry out the obligations of defendants with reference to the development of the lands and the payment of interest and maturing principal; that since said time

the committee has defaulted in the payment of interest on the bonds and in the payment of taxes on the lands; that plaintiff has unsuccessfully demanded of defendants the return of the moneys he paid to them; and that by reason of the premises plaintiff has been defrauded and has suffered damage, etc.

In the second count it is alleged that *"shortly* prior to the year 1927,"* defendants falsely and fraudulently represented to plaintiff, to wit: That they had for sale certain bonds issued by St. Mary Parish—Avoca Drainage District of the State of Louisiana, that they were valuable bonds, and were well secured in this, that if the drainage district for any reason defaulted in the payment of interest or principal "the State of Louisiana was behind the bonds and was obligated to pay the taxes on the lands just the same as the private owner was required to do"; that the bonds *"were an obligation of the State of Louisiana,* and that they had an opinion of Judge R. E. Milling to that effect"; that thereafter the district made default in the payment of the interest and instalments of principal due on the bonds; that thereafter defendants appointed a committee (naming them) as a bondholders' committee, "for the purpose (as then stated by defendants) of taking means to protect the owners of the bonds," and "entered into an agreement with said committee, employed by the law firm of Judge Milling, to take action to protect the owners of bonds and to obtain payment"; that one feature of the agreement was that the deposit of the bonds "prevented the owner of said bonds from taking any action whatsoever with regard to rights that may have accrued to him out of the purchase and ownership thereof"; that plaintiff refused on defendants' request to deposit his bonds with the committee, and demanded of defendants that they return to him the moneys he had paid for them, which demand they refused; that plaintiff's bonds are abso-

lutely worthless; and that because of the false and fraudulent representations aforesaid defendants obtained from him in cash the sum of $3,876.80, which sum together with interest defendants, although often requested, still refuse to return to him, to his damage, etc.

On the day of the commencement of the trial plaintiff, by leave of court, filed a new paragraph to his declaration (to which count does not clearly appear) and it was ordered that defendants' plea of the general issue and special plea of the statute of limitations, previously filed, stand as pleas to the declaration as amended. The new paragraph is in substance as follows: That defendants, for the purpose of "concealment" and "keeping plaintiff in ignorance of the said frauds" practiced upon him, "paid the interest" on his bonds as the same from time to time matured, and thereafter for the same purpose "conspired and confederated with the Mississippi Valley Trust Co., and others to plaintiff unknown," and formulated a bondholders' protective committee, "prolonging the time of payment of interest and other obligations to plaintiff until the fall of 1927," when plaintiff "caused an investigation to be made of the representations aforesaid with the result that he ascertained for the first time that the same were untrue"; and that he was forced to incur large expenses, etc.

On the same day plaintiff, by leave of court, filed an amended replication to defendants' plea of the statute of limitations, wherein he averred that during the period of the running of the statute defendants, for the purpose of keeping plaintiff in ignorance of the frauds practiced, "paid the interest on plaintiff's bonds," and for the same purpose thereafter "confederated with the Mississippi Valley Trust Co., and others to plaintiff unknown, and organized a bondholders' protective committee which pretended to col-

lect the interest on said bonds and take proceedings necessary to enforce the supposed liability of the makers of the bonds and of the State of Louisiana''; and that thereby plaintiff was ''kept in ignorance'' of the frauds practiced as aforesaid, ''until the fall of 1927, when plaintiff caused an investigation to be made and then, for the first time, ascertained the falsity of defendants' representations as aforesaid.''

On the trial plaintiff testified in his own behalf and four other witnesses testified for him, including James L. Cooke (a bond salesman of defendants in Chicago, who as agent sold the eight bonds to plaintiff), and Charles W. Stuart (an employee of defendants, who in the fall of 1921 viewed the lands of the district for a day, investigated the ownership thereof as far as he could, and made a written report to defendants) and Justus Chancellor (plaintiff's attorney, who in the fall of 1927, examined the laws of the State of Louisiana in connection with plaintiff's bonds, and in April, 1928, made a report to his client). Plaintiff also introduced in evidence the eight bonds, defendants' printed circular or prospectus used in the sale of the bonds, and a mass of correspondence and other writings. At the conclusion of plaintiff's evidence the court made the finding and entered the judgment, upon the sole ground that plaintiff's action was barred by the statute of limitations of five years.

Plaintiff's evidence disclosed the following facts in substance: The bonds bore interest at five per cent, evidenced by coupons payable on February 1 and August 1 of each year. All interest was paid to plaintiff up to and including February 1, 1923. Interest maturing on August 1, 1923, and thereafter, was not paid. Each bond stated on its face that it is issued subject to certain provisions of the Constitution of Louisiana and certain acts of the legislature. Plaintiff purchased the bonds from Cooke, defendants' sales-

man, on November 23, *1916*. He was a man of considerable business experience,—being the vice president of a manufacturing corporation. He had purchased many bonds of defendant and other bond houses for investment. When Cooke offered the bonds he gave him the circular or prospectus concerning them, but made no representations other than those contained in the circular, which was undated and which at the top had the name of defendants' firm "Spencer Trask & Co.," and the statement "Preliminary Circular Subject to Change." Plaintiff testified that the "only reason" he purchased the bonds was because of certain statements or representations contained in the circular under the caption "Collection of Taxes," the material parts of which are as follows (italics ours):

"The collection of these taxes is provided under Section 14 of Act No. 317 of the Statutes of 1910, as amended by Act No. 227 of the Statutes of 1914. . . .

"Taxes are due on January 1st of each year. If on July 1st of any year such taxes have not been paid, the same become delinquent and the property must then be offered for sale by the State authorities. If the property cannot be sold for the amount of arrears, or if there is no bidder for the property, the land upon which the taxes are in arrears *is adjudicated to the State,* and the State *becomes liable in exactly the same manner for the payment of the taxes for that year as any property holder in the district.* The State authorities *are also obligated to make provision for the payment of such arrears in exactly the same manner as any appropriation would be made for State purposes.* This adjudication to the State is subject to the right of the former property owner to redeem such property within one year from the date that taxes become delinquent. . . . If at the end of one year said property has not been redeemed by the former land owner

or resold *the title becomes vested in the State of Louisiana.* The State *then becomes a property owner in the district,* and *is subject to the same taxation as any individual property owner within said district.*

"The Avoca Drainage District was one of the first to be formed under the above Act, and was validated through a suit carried through the lower courts and the Supreme Court of Louisiana. The decision of the courts was in favor of the district, and *rendered all taxes incontestable from any source whatsoever.*"

Other statements or representations in the circular are in part as follows (italics ours):

"These bonds are a direct obligation of Sub-Drainage District No. 1, and are issued to cover the cost of draining the lands and placing them in condition for cultivation. . . . To provide for the payment of semi-annual interest and the yearly installments of principal, a tax of $1.55 per acre is levied annually by the Board of Drainage Commissioners. In addition, a tax of 50 cents per acre is levied to provide for the operation of the pumping plants and the maintenance of the drainage system. This total tax of $2.05 per acre compares with the maximum allowance under the statutes of $3.50 per acre per year. The average selling price of reclaimed land in this district is upwards of $100 per acre. . . .

"Avoca Drainage District is situated about 80 miles west of New Orleans and the Mississippi River, in St. Mary's Parish, one of the oldest and most prosperous parishes (counties) in Louisiana, and is directly opposite the City of Morgan City. . . . Sub-Drainage District No. 1 covers an area of about 16,600 acres, and is connected with Morgan City by a new steel draw-bridge over the Bayou Boeff. The district is practically an island, being surrounded on all sides by navigable streams, which range in depth from 20 to 40 feet, and empty into the Gulf of Mexico, 20 miles to the South.

"The United States Government has recently expended over half a million dollars in deepening the waterway extending to the Gulf of Mexico, thus making Morgan City a port of entry, and permitting ocean going vessels to take the products of the soil directly from the 24 miles frontage of the District to any seaport.

"The District was organized in 1910 and actual work began January 15, 1911. The system of drainage was approved by and carried out under the supervision of the State Engineering Department, and has been pronounced by it one of the best drainage projects in Louisiana. The work is now practically completed, and while only about 4,000 acres are actually under cultivation at this time, practically the entire area is ready for planting, and will no doubt be cultivated within a short time. . . . The land is exceptionally fertile. . . . Crop values range from $50 to $200 per acre,—the soil producing as high as 77 bushels of corn or 40 tons of sugar cane to the acre. The population of the district (now about 700) should increase rapidly now that the drainage work has been completed. . . .

"The *legal details* in connection with these bonds have been under the supervision of Judge R. E. Milling . . . of New Orleans, have been tested and approved in the Supreme Court of Louisiana, and *their legality* has also been passed on by Messrs. Wood & Oakley of Chicago.

"The statements made in this circular are from official sources, or from others *which we regard as reliable,* and are the *expression of our beliefs.*

(Signed) Spencer Trask & Co.

Chicago."

Plaintiff further testified that just prior to his purchase of the bonds he discussed with Cooke many of the statements contained in the circular and particularly the statements under the caption "Collection of

Taxes'' and that Cooke then ''advised me that *in the final analysis the State of Louisiana was liable for the interest and principal of the bonds* in case the District defaulted.'' But it clearly appears from plaintiff's letter to defendants, dated August 30, 1927 (i. e., nearly 11 years after he had purchased the bonds and about 4 years after all interest payments on them had ceased) that plaintiff when he purchased the bonds relied wholly upon the statements *in the circular* and not upon any advice given or opinion expressed by defendants' salesman, Cooke. In the letter plaintiff wrote:

''The facts of the matter are I purchased $4,000 Avoca Drainage Dist. Bonds from your representative, the sale being predicated *upon the statements contained in your circular*. It was stated that the *State of Louisiana would be legally liable for the payment of the bonds* in case of a default of the drainage district. Evidently this statement was in error. That being the case, I ask that you repurchase the bonds and pay the interest in default. I would dislike the idea of *having a suit over this matter,* but if it is to be contested will give the matter to my attorney as soon as your reply is had. In conclusion, permit me to say I would not be the owner of these bonds if it were not *for the statement in the circular* holding the State of Louisiana responsible *in the finality.*''

Plaintiff's evidence further disclosed that several months after the default in the payment of the interest due on the bonds on August 1, 1923, a bondholders' protective committee was organized, consisting of representatives of certain parties, including defendants, who about eight years before had brought out the issue. About May 1, 1924, plaintiff was informed by defendants' letter of the committee's organization and that, in view of the continued defaults in the payment of interest, etc., it was advisable that concerted action

be taken to protect the interests of all bondholders, and he was urged to deposit his bonds with the committee. A form letter was inclosed, signed by the committee, dated May 1, 1924, in which it was stated that the formation of the committee had become necessary because of certain facts in substance that a majority of the lands in the district *had been adjudicated to the State of Louisiana* for the taxes of 1922, which taxes had not been paid for that year or the succeeding year (1923), that the period of redemption for the year 1922 taxes would expire about June 24, 1924, that there then would arise the question *whether the title would remain in the State* (a condition to be avoided if possible), and that concerted action by all bondholders should immediately be taken to provide for the redemption of the bonds and to work out a plan, by bringing new taxpayers upon the land and by other means, whereby the tax deficiency might be made up and the defaulted interest coupons and matured principal be paid. About July 16, 1924, plaintiff also received by mail a printed copy of the proposed bondholders' protective agreement, in which the above and other facts were set forth. It therefore appears that by July, 1924, plaintiff had notice and knowledge of the situation, and that the State of Louisiana was not going to pay the taxes on the lands in default of their payment by the respective owners. Yet he did not see fit to join with other bondholders and become a party to the bondholders' agreement. In fact, he stood by and did practically nothing until the summer of 1927 (a period of three years) when, being in New York City, he called at defendants' office there and demanded the return of the money he originally had paid for the bonds with accrued interest, which demand was refused. After returning to Chicago he wrote the letter of August 30, 1927, above mentioned. And during the fall of that year he retained an attor-

ney, Justus Chancellor, to investigate and report "whether or not I could collect the amount of money I had invested in the bonds." Chancellor testified that he made an investigation into the matter, studied the laws of Louisiana, reviewed numerous decisions of the Supreme Court of that State, and in "the spring of 1928" made a report to plaintiff, in which he expressed the opinion in substance that the State of Louisiana was not liable to pay taxes on the lands of the district and "was not in the business of *paying* taxes," and that it could not be held liable to pay plaintiff's bonds. The present action was not commenced by plaintiff until January 13, 1931, nearly three years after Chancellor had made his report, and *over six years* after plaintiff had been notified by defendants that the State of Louisiana was not liable to pay taxes on any lands in the district. And it is to be noticed that the "advice" claimed to have been given to plaintiff by Cooke, or the particular statements relied upon by plaintiff as contained in defendants' circular, received by plaintiff prior to his purchase of the bonds, were mere expressions of opinion on questions of law. And it is well settled that "ordinarily one is not liable for false representations respecting a mere question of law." (*Dillman v. Nadlehoffer,* 119 Ill. 567, 577; *Fish v. Cleland,* 33 Ill. 238, 243; *Upton v. Tribilcock,* 91 U. S. 45, 50.)

After carefully reviewing plaintiff's evidence, we are of the opinion that the finding and judgment of the superior court, on the ground that plaintiff's cause of action for claimed fraud and deceit was barred by the statute of limitations of five years, were right, and that the judgment should be affirmed. In section 15 of our Limitations Act (Cahill's St. 1929, ch. 83, ¶ 16, p. 1672) it is provided in part that "Actions on unwritten contracts, expressed or implied, . . . or to recover damages for an injury done to property,

real or personal, . . . *and all civil actions not otherwise provided for,* shall be commenced within five years next after the cause of action accrued." In *Bates v. Bates Machine Co.,* 230 Ill. 619, 621, it is decided that as there is no specific provision in our Limitations Act concerning actions on the case for fraud and deceit (of which the present action is one) such actions are governed by said section 15 and are barred in five years. (See, also, *Keithley v. Mutual Life Ins. Co.,* 271 Ill. 584, 592.) In section 22 of the act, Cahill's St. ch. 83, ¶ 23, it is provided that "If a person liable to an action *fraudulently conceals* the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within five years after the person entitled to bring the same discovers that he has such cause of action, and not afterwards." In the *Keithley* case, *supra,* which was an action on the case for fraud and deceit, after reviewing several prior decisions of our Supreme Court, it is said (p. 594, italics ours): "The doctrine announced in these decisions is, that the *fraudulent concealment* of a cause of action which will prevent the running of the Statute of Limitations must be some affirmative act or representation *intended to prevent* the discovery of the cause of action, which *does actually prevent* such discovery; that a replication setting up such fraudulent concealment must set out the facts constituting the concealment; that the fraudulent misrepresentations which form the basis of the cause of action do not constitute a fraudulent concealment in the absence of allegations of acts or representations tending fraudulently to conceal the cause of action; that the rule that the statute begins to run only from the discovery of the fraud does not apply when the party affected by the fraud *might with ordinary diligence have discovered it; . . .* " (See, also, *Skrodzki v. Sherman State Bank,* 348 Ill. 403,

407; *Lancaster v. Springer,* 239 Ill. 472, 482.) In *Ramsey v. Child, Hulswit & Co.,* 198 Mich. 658, a fraud and deceit case where a similar statute was invoked, it was held in substance that there was no fraudulent concealment of a cause of action of fraud in the sale of certain bonds, so as to make available the provisions of the statute, where a purchaser of the bonds from a bond house did not receive interest on her coupons at the time they were due and was afterwards informed that the enterprises were in serious financial straits, and the organization of bondholders' protective committees was urged, and such organizations were perfected, and she otherwise received information that should have put her upon inquiry. In its opinion the Supreme Court of Michigan used language which we think is peculiarly pertinent to the facts of the present case, viz. (p. 669): "An analysis of the notifications and proceedings relative to the bondholders' protective committees does not impress us that they were designed, or could have had the effect to *conceal* the cause of action, but rather to *reveal* it. The effort seems to have been to induce plaintiff, notwithstanding the ground for action revealed, to hold to her investment and take her chances in the ultimate outcome. This is by no means *concealment.* . . . (p. 671, italics ours.) While regretting the situation in which appellant now finds herself, we cannot escape the conclusion that Miss Ramsey, if not with positive knowledge of the falsity of the representations which she claims induced her to make her unfortunate investment, at least with an abundance of information which should have led to a prompt investigation, *slept on her rights* and chose rather to await the results of the efforts of the committees to save for the bondholders at least a portion of the face of their bonds; and that *having been disappointed in the outcome of the course she elected to pursue,* she

now brings a *belated action* and seeks to induce the court to relieve her *from the situation in which she finds herself by her own negligence.* We think the attitude of the courts on this subject is well expressed in the following language of Justice Swayne of the Supreme Court of the United States in the case of *Wood v. Carpenter,* 101 U. S. 135 (139) :

" 'Statutes of limitations are vital to the welfare of society and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay, extending to the limit prescribed, is itself a conclusive bar. The bane and antidote go together.' "

We fail to find in the present transcript sufficient evidence, or indeed any evidence, showing that defendants, with *intent to defraud,* concealed from plaintiff any cause of action that he might have had against them by reason of the sale of the eight bonds to him. It is alleged in substance in the amendment to plaintiff's declaration, as well as in his replication to defendants' plea of the statute of limitations, that for the purpose of fraudulently concealing from him the fact that he had a good cause of action for fraud and deceit against them, they "paid the interest" on the bonds as it matured on several occasions prior to the default in such payment in August, 1923, and much is attempted to be made of this fact in the printed argument of plaintiff's counsel filed in this court. But even if it be considered (for the sake of the argument only) that the acts of defendants in so doing amounted to such a fraudulent concealment, it cannot be of any

avail to plaintiff in this belated action, which was not commenced until January 13, 1931. When the payment of the interest ceased in August, 1923, and was not resumed, there could in August, 1923, and thereafter, be no *concealment* of plaintiff's cause of action for this particular reason. And plaintiff's action was not commenced until nearly eight (8) years after the last payment of interest was made in February, 1923.

For the reasons indicated the judgment of the superior court, appealed from, should be affirmed and it is so ordered.

*Affirmed.*

KERNER, P. J., and SCANLAN, J., concur.